T. H. SYMINGTON CO. v. NATIONAL MALLEABLE CASTINGS CO. et al.

(District Court, N. D. Illinois, E. D.   April 10, 1919.)

No. 871.

1. PATENTS ⬤⇒129—SUIT FOR INFRINGEMENT—ESTOPPEL BY LICENSE.

Where patents cover two distinct types of a device, a licensee to manufacture one type only, when sued for infringement by making the other type, is not estopped to deny the validity of the patents as to such type.

2. PATENTS ⬤⇒328—VALIDITY AND INFRINGEMENT—FRICTION DRAFT GEAR.

The Ritter patents, No. 684,552 and No. 751,943, for friction draft gear for railroad cars, *held* valid, but not infringed, as to the expansion type shown therein, by a gear having a distinctly different mode of operation.

In Equity.   Suit by the T. H. Symington Company against the National Malleable Castings Company and William H. Miner.   Decree for defendants.

George A. Chritton, of Chicago, Ill., and Melville Church and E. F. Mechlin, both of Washington, D. C., for plaintiff.

Rector, Hibben, Davis & Macauley, of Chicago, Ill., for defendant company.

Haight, Brown, Haight & Harris, of Chicago, Ill., for defendant Miner.

SANBORN, District Judge.   Injunction suit, filed April 28, 1917, on patents 684,552, issued October 15, 1901, and 751,943, issued February 9, 1904, on friction draft gear.   Defendant corporation is licensee under the patents in suit and two others, but the license covers only one kind of gear, known as the "included" type.   So far as the four patents cover other kinds, they are not transferred.

Defendant Miner has been engaged in making and selling draft gear since 1907.   He furnishes to the Castings Company drawings of the parts of the gears, also working details, from which the latter furnishes to him some of the parts, and another part from stock furnished it by Miner.   Other parts are bought by Miner from other manufacturers.   The gears are assembled by Miner at the Grant Locomotive Works in the Castings Company's plant, where a section is reserved for him by the Castings Company for the purpose, for which he pays rent, and where he has also space and machinery for testing the gears.   Each pair of gears, suitable for one railroad car, is fully completed for installation by Miner when sold by him.

The questions raised are whether the Castings Company is estopped by the license in respect to the type of gears not covered by it, whether Miner's relation to the corporation is such that he is bound by the estoppel, whether defendants are joint infringers, and whether there is any infringement, either on the assumption that both defendants are bound by the estoppel or the contrary one.

[1] The patents and structures in evidence relate to draft gears for passenger and freight cars, in which the impact is sustained partly by very heavy coiled springs and partly by the friction of steel

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

surfaces sliding on each other; some of the surfaces being inclined to the line of movement of the drawbar, and so arranged that the wedge elements expand and grip either the center bar or outside shell. The mechanism being confined in a box or cylinder, the force of the impact against a movable wedge riding on the surface of a shoe which is parallel to the inclined wedge surface, sets up forces at right angles to the general line of movement, and is so arranged as to grip either the central drawbar or the inside face of the cylinder or housing, thus creating sliding frictional resistance. Where the drawbar is gripped by the frictional elements, the device is known as belonging to the "included" type; and where the pressure is radial or outward, to the "nonincluded" or expansion type. The first patent in suit relates to the "included" type, and the second to the "excluded" one.

The license referred to is dated June 13, 1913, and recites that—

"Whereas, the National Malleable Castings Company, a corporation duly organized and existing under and by virtue of the laws of the state of Ohio, and having its principal place of business in the city of Cleveland, in said state, is desirous of acquiring the exclusive right under each and all of the letters patent aforesaid to manufacture, use, and sell draft rigging of the included friction type solely, that is to say, draft rigging having an internal friction member or plunger, with other members located exteriorly thereof and adapted to press or to be pressed inwardly to coact with said central member, as contradistinguished from those in which the friction members move or press outwardly or expand radially and coact with the inner face or surface of a shell or casting, or the like." Therefore there was granted to defendant corporation, "under each and all of the letters patent aforesaid, the exclusive right or license to make, use, and sell, for the full term of each and all of said letters patent aforesaid, draft rigging of the included friction type, as above specified."

The corporation was also given the right to sue for infringements occurring after the license. The license raises no estoppel against the licensee in respect to the noninclusive type of gear. It does not convey any property right, but simply exempts the licensee from suit by the assignor so long as the former makes, uses, or sells only the "included" kind of gears. Analogies drawn from the law of real estate or leaseholds may serve to illustrate, but at the risk of false analogy. Chicago & A. R. Co. v. Pressed Steel Car Co., 243 Fed. 883, 156 C. C. A. 395.

The patentee, for $1,500, paid, has agreed that he will not prevent the licensee from making the "included" gears, or bring suit, or in any way call it to account. He has made no agreement as to the "nonincluded" type. In respect to this he stands on his patent rights; the license being silent as to the "nonincluded" gearing, except that it recites that the licensee is desirous of acquiring the exclusive right "to manufacture, use, and sell draft rigging of the included friction type *only*." This implies merely that it does not desire to make, use, or sell the other type, but falls short of an agreement that it will not do so. The granting clause throws no further light on the matter.

It is difficult to see how the licensee can be estopped in respect to the nonincluded type. It took nothing by the license as to this, no immunity from suit, and assumed no obligation respecting it. In Indiana Mfg. Co. v. Nichols & Shepard Co. (C. C.) 190 Fed. 579,

defendant was licensed under 55 patents to make a certain type of machine, and was sued for making another type. Judge Denison said:

"The estoppel must be mutual. The licensee may not deny the patentee's title to the monopoly; the patentee may not deny the licensee's right to act under that monopoly. It is difficult to see how, when the act involved is the manufacture of a certain machine, at a specified place or in a specified way, and both complainant and defendant agree that there is no contract in existence permitting the act in controversy, either party can be estopped by a contract relating to something else.

"We may apply, further, by analogy, the rule of landlord and tenant, which is the basis of estoppel by a patent licensee. If the landlord claims title to lots 1, 2, and 3, and leases to the tenant lots 1 and 2, and the tenant then undertakes to occupy lot 3, the lease would not be a bar to ejectment by the landlord for lot 3, nor would the lessee be estopped to deny the landlord's title to lot 3. It seems to me quite clear that the complaining patentee cannot, at the same time, maintain the position that the act of the defendant licensee, manufacturing what is said to be the patented article, is outside the conditions of the license, and therefore not authorized by the license, and also the position that his title to the monopoly is conceded by the license, and therefore cannot be disputed." Underwood Typewriter Co. v. Stearns, 227 Fed. 74, 141 C. C. A. 622; Auto Spring Repair Co. v. Grinberg (C. C.) 196 Fed. 52; Tate v. B. & O. R. Co., 229 Fed. 141, 143 C. C. A. 417.

The licensee not being estopped, in this suit charging infringement by the making and sale of the "nonincluded" type of gearing, of course Miner cannot be. The prior art is therefore open to both defendants.

In regard to the question whether defendants would be jointly liable for infringement, see Consolidated Rubber Tire Co. v. Goodrich (D. C.) 237 Fed. 893; Tatham v. Le Roy, Fed. Cas. No. 13,762.

*Defense of Laches.* Laches is also pleaded as a defense. It is shown that Ritter in 1913, and while he still owned the patents, saw an affidavit filed in an interference in the Patent Office showing that Miner was making the alleged infringing gear in September, 1913. Assuming that this would put him on inquiry, yet there is nothing to show that Miner relied on Ritter's failure to give notice of infringement, or was in any way injured by the delay. This suit was brought within four years. The defense is not proved.

[2] *Infringement.* The license having given the Castings Company the right to the included gears, the latter was probably free to make the nonincluded type so far as the first patent is concerned. But as the defendant Miner is not bound by the license, and takes no rights under it, and the second patent relates more specifically to the nonincluded form, this point may be laid one side, and the question of infringement considered at large.

Since there is no estoppel on either defendant, the prior art may be considered. The important question is whether the Miner gear is "gradually applied and withdrawn" (quoting from the first Ritter patent).

Plaintiff's counsel, Mr. Church, clearly describes the general features of draft gear:

"The ideal draft gear would be one which offered the maximum resistance to the movement of the drawbar inwardly or outwardly from its normal position, but which at the same time would tend to return the drawbar to its

normal position with the minimum force necessary to effect this return and to restore adjacent cars to their normal positions with respect to each other. It is obvious that springs alone would not constitute the ideal device because the energy with which they would expand to normal position would be substantially equal to that required to compress them, and therefore much more than would be required to accomplish the results desired in the return or release of an ideal draft gear.

"The addition of friction elements to a spring draft gear, besides serving the purpose of controlling recoil, provides at the same time and in the same manner a means for increasing the total capacity of the entire draft gear, as the friction grip mechanism which tends to retard slightly the movement of the drawbar in its return to normal position operates also to resist the inward movement of the draft gear under buff and its outward movement under pull, thereby making the total capacity of the gear equal to that of the spring and of the frictional load induced by the mechanism.

"It should be borne in mind that the force required to compress a simple spring draft gear is directly proportional to the amount of such compression, or in other words to the distance the spring is compressed. For instance, if it requires 7,500 pounds to compress a certain simple spring one-half inch, it will require 15,000 pounds to compress it one inch, and 30,000 pounds to compress it two inches. Under a two-inch compression, such a spring will be exerting in opposite directions a force of 30.000 pounds, and if it were gradually released or allowed to expand it would exert at each point in its release a force proportional to its compression at that point."

Following this description he states plaintiff's claim of the Ritter invention:

"The Ritter patent covers a means of controlling the recoil of a draft spring by the use of wedges against which the draft spring abuts, so that, the greater the pressure exerted upon this spring directly or indirectly by the drawbar, the greater is the pressure which the spring exerts upon the abutting wedge blocks. The frictional resistance which is developed between these wedges and the surface of the drawbar extension, with which they are in contact, bears a fixed and definite ratio to the pressure applied on the spring, this frictional resistance increasing as the spring pressure increases and decreasing as the spring pressure decreases.

"The increase of frictional resistance as the draft gear is being compressed, and the decrease in this resistance as the draft gear is being released, is gradual in the sense that it is not suddenly brought up to its maximum nor reduced to its minimum. The word 'gradual,' as used in Ritter patent, No. 684,552, does not indicate the length of time which elapses during any draft gear movement, but it serves to describe the building up or reduction of the frictional resistance in proportion to the pressure exerted upon the frictional members by the spring, even though either operation may take place in a very small fraction of a second of time.

"In an efficient draft gear it is essential that the parts shall be quickly restored to normal position after an impact which has closed the gear, in order that the gear may be ready to take a succeeding impact which may follow in a very short interval of time. To illustrate: If, in a heavy train, the drawbars connecting two adjacent cars were fully extended, and their respective draft gears therefore fully compressed by the tractive effort of the locomotive, and if under this condition the brakes were suddenly and fully applied, a very slight difference in the time of effective brake application between these adjacent cars might and does cause a collision between them, so that the drawbar on each of these two cars must change almost instantaneously from its extreme outward to its extreme inward position, each moving a distance equal to twice the travel of a single-ended draft gear.

"During this movement the gear, if efficient, must expand to normal length, and immediately close again, in order to protect the car from the impact resulting from the collision described."

The feature of quick release of defendants' gear is thus described by Mr. O'Connor:

"Naturally the device should be sensitive and capable of following up the release of the pressure on the follower due to the coupler and cars. In a test of compression of this gear, where the speed is perhaps say, six miles per hour, the whole cycle is not one-tenth of a second, and the compression of the device will take place in one-fourth of this tenth; probably one-fourth of the time expended in compression and three-fourths in release.

"Upon release, when the pressure on the coupler is reduced, such as the recoil of the cars or other devices, the release of the coupler, why, the pressure on this wedge, which is at the time of complete compression very high, as it reduces, the elasticity of the shell collapses, follows the rollers, the rollers follow out on the faces of the shoe and force the wedge out a slight amount relative to the shoes, releasing the pressure and the spring acting to release the whole device."

The witness Johnson also describes the two operations:

"On inward movement, all of the stress imposed upon the wedge is transferred through the rolls, which move slightly, since they spread the shoes against the cylinder until the pressure is removed, when immediately, owing to these antifriction rolls, the combination you might say collapses, breaking the friction contact between the cylinder and the shoes and permitting a powerful release. The release is very sensitive—a cycle of action not over one-tenth of a second."

So the whole question of infringement depends on whether defendants' gear falls within the conception of Mr. Ritter as described in his patents. That description and the gist of the invention is the combination of an included and including friction element, relatively movable, one in wedge form, an incline, and a spring, between the load and one element, "whereby the friction grip is gradually applied and withdrawn, and is always proportioned to the load."

Mr. Ritter further says, in description of the first patent, that the wedge-friction elements will exert a—

"friction grip on the drawbar proportionate to the load; the grip, however, being measurably a yielding grip, which will not give rise to any sudden shock, either in its application or release, both of which will be gradual."

In his testimony Mr. Ritter further said:

"When the spring begins to expand, the friction, which is proportional to the amount of pressure delivered on the wedge-shaped elements, prevents the sudden recoil of the spring; the friction being greatest at the time there is the greatest opportunity to recoil, and gradually diminishing as the pressure of the wedges becomes less and less as the spring expands, and being always, however, proportional to the pressure on the springs, so that if there is a great recoil pressure stored up in the springs there is a correspondingly great checking pressure of the friction to resist it, and as the recoil power of the spring diminishes and diminishes so the frictional braking pressure diminishes and diminishes."

The operation of the Ritter and Miner gears may be thus compared: When the buffing action begins, the drawbar is driven inwardly against what may be assumed to be the left-hand end of the spring. The other end is thus pushed to the right, moving the wedge against which it abuts at all times along the incline of the other wedge element, thus

exerting inward pressure against the plunger or central element, which is a continuation of the drawbar, and moves with it to the right. Such movement of the wedge and central element continues to the full limit of its travel, fully compressing the spring and exerting the maximum gripping pressure on the central bar. This friction grip is at all times proportionate to the load. If the spring is compressed one-half, the grip on the central bar is one-half.

On the recoil the action is reversed. The buffing load has been removed, and the recoil of the spring returns the parts to the normal or idle position. At the beginning the grip on the bar is at its maximum. The right-hand end of the spring is still pushing the wedge. When the spring has moved the drawbar and central bar half way back, the grip on the latter is half the maximum. The same proportionate grip remains to the very end of the recoil, when the spring still presses on the wedge on account of its initial compression, so that there is always some friction on the central member. There has thus occurred the gradual application and withdrawal referred to (not quite complete) of the frictional grip.

This description substantially applies to both patents in suit. Claim 13 of the second one counts on "a variable frictional resistance proportionate to the load."

The release action of the defendant's gear is quite different—bearing in mind that the gear is of the expanding type, and not the gripping type, so that, instead of the shoes surrounding a solid central post, they press against an outer, elastic, steel friction shell or cylinder, which is assumed to be an equivalent construction to the other, except the feature of elasticity of the shell. On complete compression the pressure against the inside of the cylinder is very high. On release the load is removed from the wedge, the spring expands, the elasticity of the shell collapses, and the spring continues to force back the shoes, not against a sliding friction, as in Ritter, but through the rollers between wedge and shoe, with the result that the whole structure quickly collapses on removing the load. This is the action of the Miner gear, as clearly shown by all the oral evidence as well as the two gear models. The rollers do actually roll about a sixteenth of an inch.

There is, therefore, a distinct mode of operation which negatives infringement. Snow v. Lake Shore & M. S. R. Co., 121 U. S. 617, 7 Sup. Ct. 1343, 30 L. Ed. 1004; State Bank v. Hillman's, 180 Fed. 732, 104 C. C. A. 98; Burroughs Adding M. C. v. Felt, etc., Co., 243 Fed. 861, 156 C. C. A. 373. This conclusion is reached without considering the prior art.

Decree holding Ritter patents valid, but not infringed. Bill to be dismissed, with costs.