## CORNELL v. CHASE BRASS & COPPER CO., Inc.

District Court, S. D. New York.
Feb. 18, 1943.

980

Henry J. Lucke and A. K. Wing, both of New York City, for plaintiff.

Frederick S. Duncan and Seymour Scott Jackson, both of New York City, and H. A. Toulmin, Jr., of Dayton, Ohio, for defendant.

RIFKIND, District Judge.

### I. Pleadings.

This action was commenced in June, 1941, as a conventional patent infringement suit seeking both an injunction and an accounting. The answer put in issue the validity of the patent and the infringement. By the time the cause was reached for trial the pleadings had lost that convenient simplicity. In an amended answer defendant added appropriate allegations under the Declaratory Judgment Act of 1934, 28 U.S.C.A. § 400, and a prayer that the patent in suit be adjudged invalid and not infringed. The amended answer further alleged that three groundless suits for the infringement of the same patent, had, theretofore, been instituted by American Radiator Company, assignee of the patent by assignment from the plaintiff, that the said patent had since been reassigned to the plaintiff, that the suits had been dismissed without trial and without prejudice, that plaintiff was at all times the beneficial owner of the patent and controlled the suits brought in the name of American Radiator Company and that the instant action was, therefore, barred by the provisions of Rule 41(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c.

The amended answer further alleged that the aforementioned suits were instituted by the "wrongful, malicious and willful conduct of the plaintiff herein for the purpose of harassment and vexation of the defendant and has caused this defendant unnecessary and great expense" for which defendant demanded that plaintiff be directed to account and that plaintiff be enjoined from such conduct in the future.

This amended answer elicited a reply which contained denials and allegations of a conspiracy on part of defendant and others to injure plaintiff in his business and employment to his damage, and closed with a prayer for reference to a master to take an accounting of the amount of such damage.

The reply was followed by a second amended answer which made some changes in the patent references.

On June 3, 1942, plaintiff served an amended reply substantially like the first reply except that the allegations of conspiracy and damage were separately stated and denominated a "counterclaim".

On June 5, 1942, defendant filed an answer to plaintiff's "counterclaim" admitting the allegations of diversity of citizenship and otherwise denying the remaining allegations. On June 10, 1942, the trial of the issues to the court was begun. On June 19, 1942, the last day of the trial defendant asked leave to serve an amended answer to plaintiff's "counterclaim", pleading the statute of limitations. Upon that, decision was reserved.

It is plain that we have more pleadings than is permitted by Rule 7, Federal Rules of Civil Procedure. Subdivision (a) provides: "There shall be a complaint and an answer; and there shall be a reply, if the answer contains a counterclaim denominated as such; * * *. No other pleading shall be allowed, except * * *." The exceptions are not here relevant. This language makes it entirely clear that only an answer may contain a counterclaim and that the reply is the final pleading.

In the instant case the plaintiff's "counterclaim", alleged in its reply, could not

have survived a motion to strike. However, no such motion was made. Had the so-called "counterclaim" been stricken there would have been no occasion for defendant's "answer to the counterclaim" and for its application to file an amended answer to such "counterclaim".

By common consent the issues joined by these illegitimate pleadings have been tried. Under the circumstances it is preferable that the parties have a decision on the merits. I have, therefore, decided to treat the plaintiff's so-called counterclaim as an amendment to its complaint, alleging an additional cause of action, and the defendant's answer thereto as an amendment of its answer.

In view of all the circumstances, defendant's application for leave to plead the statute of limitations should be granted, Rule 15, Federal Rules of Civil Procedure.

Defendant's plea that the claim for patent infringement is barred under Rule 41(a) (1) is without merit. The facts briefly are these: The patent here in suit has thrice before been the subject matter of a bill of complaint in this court. In the first of these, the plaintiff was American Radiator Company and the defendant was a corporation bearing a name similar to that of the present defendant. The action was dismissed on consent on March 13, 1936. Clearly, that dismissal has no relationship to the present action within the scope of Rule 41(a). On March 17, 1936, another action was commenced by American Radiator Company as plaintiff against the present defendant. That action was dismissed pursuant to a settlement agreement between the parties thereto and the present plaintiff, dated June 18, 1937. On September 23, 1938, American Radiator Company instituted a third suit against the defendant herein. That action was discontinued on April 16, 1940, by a stipulation between the parties to the effect that such discontinuance should be "without prejudice to the bringing of another action based on any of the claims and matters included in the above entitled action".

Assuming that the present plaintiff was the real party in interest in the American Radiator Company suits and that the previous dismissals were operative against him, the defendant has still failed to bring this suit within the scope of the language of Rule 41(a). That rule distinguishes between dismissals by notice and dismissals by stipulation. A notice or a stipulation of dismissal which is silent on the question of prejudice is made to operate without prejudice. After one dismissal by plaintiff the Rule provides that only a dismissal by notice shall operate as an adjudication There is nothing in the Rule to indicate the parties may not, in such event, expressly stipulate that the dismissal shall be without prejudice. This view of the Rule makes it unnecessary to determine at this stage whether in fact the plaintiff herein was the real party in interest in the prior actions.

II. The Patent.

The patent in suit is No. 2,025,973, issued December 31, 1935, to American Radiator Company, assignee from Edward S. Cornell, Jr., the plaintiff herein. The patent is for a hollow wrought metal body and for a method of producing it, embracing 31 claims. Only 7 of these are relied on by plaintiff and these are Nos. 1, 2, 3, 4, 5, 6 and 8. While the claims relating to the article of manufacture and the claims relating to method are separately stated there is an intimate relationship between them, perhaps an indissoluble relationship. This becomes evident from the language of the patent. Thus the patent declares:

"Further, said invention has for its object to provide an article * * * formed as an integral structure of copper and possessing inherent distinctive properties resulting from the particular mode or method of manufacturing the article * * *". Page 1, column 1, line 20.

"Further, said invention has for its object to provide an article * * * in which the angularly related portion thereof, * * * is formed by displacement of metal laterally from the body of the article by cold plastic deformation * * *". Page 1, column 2, line 4.

In support of the patent application plaintiff's attorney urged that, "The method claimed will produce only the product claimed and the claimed product can only be produced by the method claimed." [Exhibit 240, page 26.]

The article for which invention is claimed is illustrated by a copper tee of the kind used to make connections between metal tubes, having the characteristics described in the claims. The method for which invention is claimed is the mode by

which that article is produced and endowed with the characteristics attributed to it.

### III. Infringement.

My first inquiry will be directed to the question whether the defendant has infringed the method claim. The only method claim relied on is No. 8, which reads as follows: "8. The method of producing a lateral branch tubular fitting of cold wrough(t) metal predominantly of copper content, which comprises subjecting in cold state a hollow cylindrical blank of metal predominantly of copper content to endwise pressure to cylindrically form the end portions of the blank and displace metal from the blank intermediate the end portions as a solid mass laterally of the blank and forming such displaced metal into a lateral branch the wall of which has a cubical content exceeding the cubical content of the zone defined at its outer boundary by the outer periphery of the lateral branch and having a wall thickness equal to that of the body."

The tools employed in practicing the method of the patent are illustrated by drawings and consist essentially of (1) a split die composed of two similarly shaped halves, in each of which there is a recess, so arranged that when the two halves are brought together, the recesses will define the exterior shape and contour of the tee, and (2) punches and mandrels whose shape and size correspond to the desired inner contour of the tee and which are introduced into the die through openings provided for the purpose.

The method is described in substance as follows: "In producing a T according to my invention and method I preferably employ a tubular blank 15 composed of metal of the character above described which has been partially worked by drawing so that the grain structure has a directional trend longitudinally of the blank. * * * The blank 15 is then placed into the die halves 10a * * * and the two die halves are brought together and securely clamped in any convenient manner placed in a suitable press". Page 2, column 1, line 65.

Pressure of a high order is then applied by means of a powerful, quick acting press to the outer ends of the punches. These punches are inserted into the die and forced into the metal within the die until only a thin filament of metal separates their approaching heads. The displaced metal enters the lateral and envelopes the mandrel inserted therein. When the tee is removed from the die a web separates the angular portion of the tee from the run similar to the filament in the run. These filaments are removed by drilling and reaming. Neither claim 8 nor the description of the method suggests the use of heat at any stage of the process. Indeed, the use of heat in the treatment of the metal is excluded, page 2, column 2, line 64. Claim 8 speaks only of "cold wrought metal".

The accused method differs from the patented method in every essential respect. The only elements of correspondence are that a die is employed and that a copper tee is produced. The accused method is described as follows:

"A sheet metal disk of copper, like that shown in Fig. 1, is first stamped up into the cup-shaped form shown in Fig. 2, and then by a subsequent series of alternate annealings and drawing operations, is converted into the test-tube-shaped shell of Fig. 3.

"The shell of Fig. 3 is now filled with liquid and placed in a split die of the character shown in Fig. 4, and the pilot A of a plunger B, shown in Fig. 4, is forced downwardly into the open end of the shell of Fig. 3. The pilot A is provided with a right-angled fluid-relief channel C having its lateral arm D intersecting the periphery of the pilot A at a predetermined point below the shoulder E at the inner end of the pilot A. As the pilot descends into the open end of the blank of Fig. 3, some of the contained liquid escapes through the channel C until such time as the lateral arm D of the channel is covered by the inner face of the wall of the blank. The plunger B continues to descend and thereby the shell is caused to assume the shape shown in Fig. 4.

"The partially-formed blank of Fig. 4 is now annealed, and after having been filled again with liquid, it is subjected to further operations as by a plunger F of Fig. 5 to reach the shape illustrated in Fig. 5.

"The blank of Fig. 5 is now preferably removed from its die and annealed, and it is then re-filled with suitable liquid and placed in the die, Fig. 6, which is provided with stop-blocks G and H, against the respective inner faces of which the rounded ends of the blank are forced by the descent of the plunger I of Fig. 6.

"The partially formed Tee shown in Fig. 6 is now trimmed at each of its three

terminals to produce the all-male Tee of Fig. 7.

"The all-male Tee of Fig. 7 may be now converted by a suitable expanding operation upon each of its three terminals into the finished all-female Tee of Fig. 8." See Exhibits 21 and 22.

The accused process is begun upon a sheet metal disk. That is converted into a test-tube shaped article by a series of drawings and annealings. In all, the metal blank is subjected to ten separate heat treatments, in order to restore its capacity for being worked. While, like in the patented process, the exterior contour of the tee is formed by the configuration of the die, the interior is not formed by a punch but by a liquid which is maintained within the tube under pressure and which prevents the collapse of the tube as it is fed into the die. At no time is the tube converted into a solid mass, as is the case under the patented process, nor do any filaments remain which have to be drilled or reamed since the tube is hollow throughout the process. When the tee is removed from the die the two ends of the run are closed. These are trimmed; and all ends are then shaped to conform to an all-female tee.

These are but a few of the conspicuous differences between the two processes. The testimony is clear that these differences are not variations introduced to create the appearance of disparity. They are necessary and indispensable steps in following the accused method. Such is the disparity between the two methods that the conclusion is inescapable that the defendant has not followed the teaching of the patent and that it has not trespassed upon plaintiff's claimed monopoly.

 This conclusion is corroborated by the action of the Patent Office, which, on April 30, 1940, granted a patent to Wendell covering the process employed by defendant. The Wendell patent having been issued after the Cornell patent, the inference is permissible that the Patent Office did not regard the later an infringement of the earlier. In Kokomo Fence Machine Co. v. Kitselman, 1903, 189 U.S. 8, 23, 23 S.Ct. 521, 527, 47 L.Ed. 689, the Supreme Court said: "The presumption from the grant of the letters patent is that there was a substantial difference between the inventions."

In Knowles v. 138 West 42nd St. Corp., 2 Cir., 1930, 43 F.2d 929, 930, the court expressed the view that, "As the Clark patent on which the defendants' device is made was applied for and issued after the plaintiffs' patent had been granted, there is a presumption that there is a material and patentable difference between the structures of the patents." .

This presumption is strengthened where, as here, both patent applications were for a time pending together in the Patent Office. Boyd v. Janesville Hay Tool Co., 1895, 158 U.S. 260, 261, 15 S.Ct. 837, 39 L.Ed. 973.

Plaintiff attempts to torture the steps of the defendant's method into the formula disclosed in claim 8. But the correspondence is lacking. Defendant's ten heat treatments or anneals do not accommodate themselves to the patent's "cold wrought metal". Nor is the lateral of defendant's tee formed by the displacement of metal "as a solid mass".

 I conclude that plaintiff has not established defendant's infringement of claim 8.

In view of what has already been said concerning the relation between method and product it would indeed be strange if this noninfringing method could produce an infringing article. The evidence is quite clear that the accused article does not infringe.

Claim 1 reads as follows: "1. As a new article of manufacture, a lateral-provided pipe fitting of integral wrought metal predominately of copper content; provided with a body having a longitudinal passage therethrough; end portions respectively having openings for affording connection each with an end of a pipe; said end openings communicating respectively with the longitudinal passage of the body; and a lateral having an opening communicating with the longitudinal passage of the body; said body and said end portions and said lateral being each of integral metal devoid of joint and integral respectively with one another and cold worked to final status; the lateral having a cubical content exceeding the cubical content of the zone defined at its outer boundary by the outer periphery of the lateral and having a wall thickness equal to that of the body."

Claims 2, 3, 4, 5 and 6 add particular features analysis of which is not essential.

Plaintiff, of course, does not contend that he owns a monopoly of all metal tees. Such articles are of ancient origin and universal use. The characteristics of the patented tee which, according to claim 1,

set it apart from tees generally are found in the words of the claim, "said body and said end portions and said lateral being each of integral metal devoid of joint and integral respectively with one another and cold worked to final status".

An issue developed at the trial concerning the meaning of "final status", plaintiff contending that it meant the condition in which the article was ready for its intended use as a pipe fitting, and defendant contending that it meant a state reached by a metal when worked to the maximum of its capacity. I accept the plaintiff's contention.

There was also dispute concerning the meaning of the last clause of claim 1, defendant urging that the language was meaningless. It is clear, however, that it means at least this: that the lateral branch of the tee is not derived from the metal resident in that portion of the original tube in which it appears to be rooted, since it contains more metal than that subtended portion of the tube. That characteristic is also true of cast tees. We return, therefore, to the crucial attribute, namely, that the patented article is "cold wrought to final status".

The accused tee is not cold wrought to final status. On the contrary, it is an essential part of its manufacture that it be subjected to frequent heat treatment so as to restore the capacity of the blank for further working. This difference is visible in the photomicrographs. The patent, page 4, column 1, line 54, refers to these micrographs as showing a grain structure which is characteristic "of a metal work-hardened to a degree approaching the maximum. * * *" The micrographs of the accused tee show quite a different structure.

I conclude that the article claims 1 to 6 are not infringed by defendant.

## IV. Validity.

In the fall of 1935, shortly before plaintiff's patent issued, the defendant published an advertisement of the accused tee captioned: "You've needed it. Here it is. The wrought one-piece copper tee". The advertisement continued: "Here's the fitting you've been waiting for—a one-piece, seamless Tee of nonporous wrought copper". Certainly, this constitutes an admission by defendant that the trade needed such a tee, that such a tee had not been obtainable in the market, and that at last it was available. Other parts of the advertisement indicated that such a tee had advantages over tees previously obtainable. The advantages attributed by defendant to its tee would likewise apply to plaintiff's tee. However, even if we grant that plaintiff's tee is new it does not follow that it represents patentable invention.

Cover v. Schwartz, 2 Cir., December 17, 1942, 133 F.2d 541. In that case the court quoted from Buchanan v. Wyeth H. & M. Co., 8 Cir., 47 F.2d 704, 712: "It seems that no one did discover this exact use for the locknut in combination with other elements up to Buchanan's time, but some one had to think of it first, even if it constituted merely mechanical skill."

In the Cover case the court also reasserted the proposition that the "long felt want" argument was useful only when invention was in considerable doubt.

Defendant's first attack upon the validity of the patent is founded upon its own anticipation. The evidence shows that in the spring of 1932, some months before the date of conception by plaintiff, two employees of defendant made some cold wrought copper tees which anticipated plaintiff's tees. But the evidence is equally clear that defendant's product was purely experimental and did not involve such a public use as to constitute a bar to plaintiff's invention. Gillman v. Stern, 2 Cir., 1940, 114 F.2d 28. It was a secret use although it might have been seen by other of defendant's employees than those engaged upon it.

The defendant's second ground of attack upon the validity of plaintiff's patent is the anticipation of other prior uses and prior art patents and publications. Most of these prior uses employ the cold working of copper and other metals by means of dies, punches and presses to produce articles of various shapes. Among them are hollow copper door knobs, electrical contact fingers, radiator tubes, copper distributor caps, steel unions for pipes and steel horse shoe calks.

If the plaintiff's application of this well-known art to copper tees, y's and elbows required no more than skill and less than invention then these prior uses are fatal to the validity of the patent. I have come to the conclusion that that is all that plaintiff did require and that the patent is invalid.

No doubt much skill and precision were required to arrange tools and dies to form

a complicated shape like a hollow tee, but once it was known to the art that copper could be squeezed in cold state from one shape into another, including hollow shapes, by means of dies, punches and presses, the precise application of that art to form a T, which as a shape was universally known, does not rise to the dignity of invention.

Plaintiff argues that I should give greater weight to the presumption of invention arising from the grant of the patent after two years of active consideration by the Patent Office. It is to be observed that he does not urge that argument upon the court in considering whether defendant's tee made by a later patented process constitutes infringement. However, such inconsistency is not unusual in the art of advocacy. The truth of the matter is that by this time it must be quite clear that the courts have been establishing more exacting standards of patentability than prevail in the Patent Office. The judicial trend is emphasized by a case relied on by plaintiff as being "most nearly comparable to that of the instant suit". But the authority plaintiff leans on so heavily, Binney & Smith Co. v. United Carbon Co., 4 Cir., 1942, 125 F.2d 255, was reversed by the Supreme Court on December 7, 1942, 63 S.Ct. 165, 87 L.Ed. —.

The prior art patents can be summarized briefly. The possibility of a wrought copper tee was disclosed in the Barthels patents, U.S. No. 653,279 issued in 1900, German No. 123,923 issued in 1899. I do not regard them as a complete anticipation because not only was the Barthels tee hand wrought but it lacked several other characteristics of the Cornell tee but at least it did teach that "the hammering of the material takes place either in cold or red-hot condition". Larkin's patent No. 689,204 issued in 1901, Kellogg's No. 1,445,140 issued in 1923 and Criley's No. 2,038,165, issued in 1936 and applied for on July 27, 1931, constitute anticipations. True, the first two speak of treating the metal in a hot state while the last is silent on temperature. But to one skilled in the art it seems that it should take less than invention to realize that since cold copper was workable, more powerful tools and pressures would accomplish for cold copper what the mentioned patents taught with respect to hot copper.

## V. Estoppel.

The plaintiff advances the argument that, notwithstanding the prior use and prior art patents, the defendant is estopped from asserting the invalidity of the patent in suit. It premises this estoppel upon the three party agreement entered into on June 18, 1937 by plaintiff, defendant and American Radiator Company. By the terms of the agreement, five lawsuits with respect to five patents were settled, defendant was given a royalty-free license to three Cornell patents and it was expressly provided that by no implication should defendant be considered a licensee of the patent here in suit.

It is plaintiff's contention that since the prior art which would invalidate the patent in suit would likewise serve to invalidate the patent under which defendant has accepted a license, and since, as licensee, it would be estopped from relying on the prior art with respect to that patent, it should likewise be estopped from relying on the prior art with respect to the patent in suit, under which it has no license and for the alleged infringement of which it has been haled into court. I am not aware of any such doctrine of "sympathetic" estoppel. The authorities do not countenance it. Indiana Mfg. Co. v. Nichols & Shepard Co., C.C.E.D.Mich., 1911, 190 F. 579, 584; International Burr Corp. v. Wood Grinding Service, Inc., 2 Cir., 1929, 34 F.2d 905, 909.

Lagonda Mfg. Co. v. Elliott Co., 3 Cir., 1914, 214 F. 578, relied on by plaintiff, does not support his contention.

At the trial the settlement agreement was received in evidence for a limited purpose which did not include its bearing upon the question of estoppel. Plaintiff moved to have it received for all purposes. Since the issue has now been considered on the merits, the motion is granted.

For the foregoing reasons I have concluded that the patent is invalid.

## VI. Counterclaims.

The proof in support of plaintiff's so-called counterclaim is so fragmentary as almost to convey the impression of abandonment. No facts have been proved from which the necessary elements of the cause of action can be inferred and no proof of damages which can be reasonably ascribed to defendant's conduct has been offered. Such claim as is adumbrated in the proof is probably barred by the statute of limitations. I am spared the necessity of passing on that question since it is clear that it must be dismissed on the merits.

986

■ Defendant in its counterclaim seeks to recover the expenses it has incurred by reason of the three prior suits relating to the patent in suit. The short answer to this claim is that the evidence fails to sustain the allegation that these prior actions which were brought in the name of American Radiator Company were in truth instituted by and for the plaintiff herein. A further answer is that all actions prior to the settlement agreement of June 18 1937, were disposed of by that agreement and that the one action instituted thereafter by American Radiator Company was discontinued by that company when the present plaintiff left its employ and took back by assignment the patent in suit which he had assigned to it during his period of employment. This claim has not been substantiated and must be dismissed.

The complaint, together with plaintiff's so-called counterclaim, is dismissed; the defendant's claim for damages is dismissed; and judgment is granted in favor of the defendant on its counterclaim for a declaratory judgment adjudicating the invalidity of the patent in suit.